CARELLA, BYRNE, CECCHI, OLSTEIN,
  BRODY & AGNELLO, P.C.
JAMES E. CECCHI
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)
jcecchi@carellabyrne.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ANDREW L. WARREN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | COMPLAINT FOR VIOLATIONS OF |
| | ) | THE FEDERAL SECURITIES LAWS |
| vs. | ) ) | |
| AURORA CANNABIS INC., TERRY BOOTH, STEPHEN DOBLER, GLEN IBBOTT, CAMERON BATTLEY, MICHAEL SINGER and JASON DYCK, | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | DEMAND FOR JURY TRIAL |

Plaintiff Andrew L. Warren, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Aurora Cannabis Inc. ("Aurora" or the "Company"), Company press releases, analyst reports, media reports, and other publicly disclosed reports and information about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all purchasers of Aurora securities between October 23, 2018 and January 6, 2020, inclusive (the "Class Period"), against Aurora and certain of the Company's executive officers and/or directors seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

3. Venue is proper in this District pursuant to §27 of the Exchange Act. The acts and transactions giving rise to the violations of law complained of occurred in part in this District, including the dissemination of false and misleading statements into this District. In addition, an earlier-filed case arising from the same nucleus of operative facts and asserting claims under the Exchange Act on behalf of Aurora shareholders was filed in this District, *Wilson v. Aurora Cannabis Inc.*, No. 2:19-cv-20588.

4. In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## PARTIES

5. Plaintiff Andrew L. Warren purchased Aurora securities during the Class Period as described in the Certification attached hereto and incorporated herein by reference and suffered damages.

6.     Defendant Aurora is a manufacturer and distributor of cannabis products based in Canada.  Aurora's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "ACB."

7.     Defendant Terry Booth ("Booth") served as the Company's Chief Executive Officer ("CEO") and a member of Aurora's Board of Directors ("Board") during the Class Period.  Defendant Booth is a co-founder of Aurora.

8.     Defendant Stephen Dobler ("Dobler") served as the Company's President and a member of the Board during the Class Period.  Defendant Dobler is a co-founder of Aurora.

9.     Defendant Glen Ibbott ("Ibbott") served as the Company's Chief Financial Officer ("CFO") during the Class Period.

10.     Defendant Cameron Battley ("Battley") was the Company's Chief Corporate Officer ("CCO") and a prominent corporate spokesperson from early 2018 until December 2019, when he abruptly left the Company.

11.     Defendant Michael Singer ("Singer") served as the Company's Executive Chairman during the Class Period.

12.     Defendant Jason Dyck ("Dyck") served as a member of the Board during the Class Period.

13.     Defendants Booth, Dobler, Ibbott, Battley, Singer, and Dyck are collectively referred to herein as the "Individual Defendants."

14.     During the Class Period, the Individual Defendants ran the Company as hands-on managers overseeing Aurora's operations and finances and made the materially false and misleading statements described herein.   The Individual Defendants had intimate knowledge about core aspects of Aurora's financial and business operations, including demand for the Company's products, capital expenditures, and compliance with licensing requirements.  They were also intimately involved in deciding which disclosures would be made by the Company.

## BACKGROUND

15.     Defendant Aurora is headquartered in Edmonton, Alberta, Canada.  The Company markets and sells cannabis, hemp, cannabis devices, and related products in the cannabis consumer and medical markets.   Aurora operates in more than 25 countries on five continents.

16.     Founded in 2006 and receiving its license to grow cannabis in Canada in 2014, Aurora has been publicly traded on the Toronto Stock Exchange since July 2017, was traded over-the-counter in the United States under the ticker symbol "ACBFF" until October 2018, and since October 23, 2018 has traded on the NYSE under the ticker symbol "ACB."

17.     Aurora has presented itself as a premier medical cannabis company with higher quality cannabis than its competitors.  Leading up to and during the Class Period, Aurora engaged in an aggressive expansion strategy, building production

capacity internally and through acquisitions and investments and launching operations in jurisdictions around the world, including most notably the European market. Several of these acquisitions were paid for in whole or in part with Aurora stock. Aurora justified this rapid expansion and spending spree as due to the purported need to rapidly ramp up production to meet exploding consumer demand. For example, defendant Booth, Aurora's CEO, claimed during the Class Period, in February 2019, that "I lose sleep over our ability to supply this global cannabis market" and that it would be "at least 5 years before we have an oversupply situation."

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

18.    The Class Period begins on October 23, 2018, when Aurora shares began trading on the NYSE.  In the days leading up to the start of the Class Period, defendants artificially inflated the trading price of Aurora securities by issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements not misleading.  For example, on October 18, 2018, Aurora issued a press release as an exhibit to a Form 6-K filed with the SEC, titled "Aurora Cannabis to Commence Trading on the NYSE," announcing that its common shares had been approved for listing on the NYSE and would commence trading effective the open of markets, October 23, 2018.  In the press release, defendant Booth touted the "growing" demand for consumer cannabis.  The press release stated in pertinent part:

"Our NYSE listing represents another important milestone that reflects our commitment to all stakeholders as we continue advancing domestic and international growth initiatives, which includes expanding our base of global institutional and retail investors," said Terry Booth, CEO of Aurora. "Aurora has rapidly developed into a globally mature organization with industry leading and technologically advanced production facilities available to produce at unprecedented scale to meet the growing demand for high-quality cannabis both in Canada and abroad. We are also uniquely committed to leveraging our deep knowledge base to further scientific research into medical applications of cannabis, and developing novel, higher-margin product offerings that strongly differentiate Aurora from our competition."

\*     \*     \*

Highly differentiated from its peers, Aurora has established a uniquely advanced, consistent and efficient production strategy, based on purpose-built facilities that integrate leading-edge technologies across all processes, defined by extensive automation and customization, resulting in the massive scale production of high quality product at low cost. Intended to be replicable and scalable globally, our production facilities are designed to produce cannabis of significant scale, with high quality, industry-leading yields, and low per gram production costs. ***Each of Aurora's facilities is built to meet EU GMP standards, and its first production facility, the recently acquired MedReleaf Markham facility, and its wholly owned European medical cannabis distributor Aurora Deutschland, have achieved this level of certification.***[1]

19.    On November 12, 2018, the Company issued a press release announcing first quarter 2019 financial results for the quarter ended September 30, 2018.[2]  The release stated that Aurora had achieved 260% revenue growth to $29.7 million and

---

[1] Emphasis has been added throughout unless otherwise noted.

[2] Aurora's fiscal year ends on June 30 of the calendar year.

that pro form revenues were up 333% during the quarter to $35.8 million.  The press release continued, in pertinent part:

**Facilities and Production update**

During and subsequent to the quarter, the Company made significant progress towards increasing its production capacity, including receipt of various sales and production licenses.  Based on grow rooms in production, the Company currently is running at an annualized run rate of 70,000 kg.  ***Management anticipates that around calendar year end 2018 into the beginning of calendar 2019, Aurora will have a production run rate in excess of 150,000 kg per annum based on grow rooms in production, with subsequent scale up to over 500,000 kg per annum (excluding additional capacity through the acquisition of ICC Labs).***

20.     Aurora's management's discussion and analysis for the quarter, filed on Form 6-K on November 13, 2019, stated in pertinent part:

***The Company's financial results for the first quarter of fiscal 2019 continued to show strong growth in its core cannabis businesses. Compared to the prior quarter, total cannabis revenue increased by 65%, while at the same time Aurora was bolstering its inventory levels to continue serving multiple customer markets***.

21.     On January 8, 2019, Aurora issued a press release providing updated second quarter 2019 ("2Q19") results for the quarter ended December 31, 2018.  The Company represented that its strategic expansion was well underway and that it was executing in not only increasing revenues, but also in controlling costs.  The press release stated in pertinent part:

"Aurora continues to execute effectively across all market segments, as demonstrated by its revenue growth anticipated to exceed 68% as compared to last quarter, supported by continued strong performance in the Canadian adult consumer use market," said Terry

Booth, CEO of Aurora. . . .  "***Going forward, we see sustained strong demand from the adult usage market, as evidenced by public statements from the Canadian provinces, as well as strong patient-driven demand for medical cannabis in Canada and abroad.***  These factors, together with our focus on disciplined management of operating expenses, and our growing portfolio of higher margin products, put us in a position to rapidly achieve positive EBITDA within the next two quarters"

22.     On February 11, 2019, the Company issued a press release announcing its 2Q19 results.   The press release stated that the Company had achieved "83% Sequential Net Revenue Growth to $54.2 Million."   In addition, the Company promoted the progress it was purportedly making on its Aurora Sky facility, which it claimed would yield production efficiencies.   The press release stated in pertinent part:

- Aurora Sky is now fully complete and commissioned, and is expected to reach its full production capacity, based on Health Canada approved planted rooms, shortly.   Recent harvests completed to date at the facility have exceeded targeted yields, reflecting that the facility's commissioning has been successful, all environmental and nutrition systems, and operating protocols are dialed in, and technology components are functioning well.

\*     \*     \*

The Company anticipates that with Aurora Sky operating at full capacity, as well as continued reduction in operating costs, the cash cost to produce per gram will trend significantly lower.   Management reiterates its expectation that the sustainable long-term operating cost at its Sky Class facilities will be well below $1 per gram.

23.     The press release quoted defendants Booth and Ibbott at length, highlighting the purported strong and sustained demand for the Company's products

and the completion of progress milestones at the Company's production facilities.

The release stated in pertinent part:

### Management Commentary

"*Aurora continues to execute strongly across all of its market segments, as demonstrated by the 83% revenue growth over last quarter and the significant increase in confirmed production results,*" said Terry Booth, CEO of Aurora. "*Our brands continue to resonate extremely well in the consumer market, our patient numbers continue to increase steadily, and we have maintained our market leadership in Germany and other key international markets. We are experiencing exceptional demand for our Canadian medical and consumer products, as well as sustained strong demand internationally. With our Aurora Sky and MedReleaf Bradford facilities ramping up production as anticipated and our other licensed facilities operating at full capacity, we are reiterating our earlier guidance of achieving sustained EBITDA positive results from the second calendar quarter of this year (our fiscal Q4)*."

Glen Ibbott, CFO of Aurora added, "We are also very pleased with our recent placement of US$345 million in convertible notes. These convertible notes were subscribed by high-quality US, Canadian, and international institutions and offer Aurora the flexibility and optionality to settle the entire principal amount of the notes in the future for cash, shares, or any combination thereof. This funding sufficiently supports the global opportunity for us to continue our commitment to growth in the legal, regulated medical and consumer cannabis systems across the globe. *This is a unique time and position as we maintain a high cadence of increasing product supply and international market expansion.*"

Mr. Booth concluded, "With our strong performance in the Canadian medical and consumer markets, our early mover advantage in a growing list of important international markets, together with our leadership in high-quality, CBD-rich hemp production, *Aurora is strategically positioned across the entire cannabis industry value chain to further extend our rapid growth.*"

24.   On February 11, 2019, Aurora hosted a 2Q19 earnings call led by defendants Booth, Ibbott, and Battley.  During the call, defendant Battley emphasized the "strong market demand" for the Company's products that purportedly justified ramping up production, stating in pertinent part:

> ***To address the continued strong market demand from the Canadian and international medical market and the Canadian consumer market, we are ramping up production rapidly***.  Currently, based on planted rooms approved by Health Canada, we are running at an annual production rate of about 120,000 kilograms or 120 million grams per year, and we expect to reach over 150,000 kilos of annual production by the end of next month based on planted and approved rooms.

25.   Defendant Battley also represented that in Europe, Aurora "continue[d] to capitalize on the strong central presence [it had] established in Germany."

26.   During the same call, defendant Ibbott similarly emphasized the "very strong demand" for Aurora's products, stating in pertinent part:

> ***With the rapid scale-up of our production and the related increase in product availability, the continued very strong demand for our products***, our planned expansion of a derivative product portfolio of these higher-margin products and continued discipline in our operating cost, we are very comfortable in reiterating our earlier guidance of achieving positive EBITDA in our fiscal Q4, that's April to June 2019, with positive operational cash flow following shortly thereafter.  We are executing well as reflected in these results and in our expectations going forward, and we are exceptionally well positioned as one of the clear leaders in the global cannabis industry.

27.   During the call, defendant Booth claimed that Aurora had an "awesome demand" for its products.  Defendant Booth also stated that he would "lose sleep over

- 10 -

our ability to supply this global cannabis market.  It is – it's coming in.  It's very fast."

He continued: "I see this world expansion as the cannabis-based [study] being close to

being set properly.  And it's at least 5 years before we have an oversupply situation

for companies that can export under EU GMP-compliant facility."

28.    On April 10, 2019, Aurora issued a press release providing an update on

its Aurora Sun construction project.  The press release stated in pertinent part:

> "Aurora Sun represents the next evolution in our Sky Class facility
> design, delivering massive scale, low cost production, and consistent,
> high-quality cannabis," said Terry Booth, CEO of Aurora.  "Particularly
> in newly-opened markets, establishing first-mover position and
> embedding Aurora's market share and brand requires a stable and
> reliable supply of high-quality cannabis for these markets.  ***The
> increased scale of Aurora Sun reflects our expectations for the long-
> term growth in global demand, especially the higher margin
> international medical markets which will be faced with significant
> supply shortages for the foreseeable future***.  Sun is also designed with
> flexibility in mind to enable us to quickly meet changing market
> demands, particularly as breeding and cultivation technologies evolve
> and as customer preferences and requirements change."
>
> *      *      *
>
> ***Ground work at the facility is nearing completion, erection of the
> steel structure is advancing and installation of the glass at Sun is
> expected to be completed in May 2019***.  Like Aurora Sky, Health
> Canada licensing requests have determined that rooms will be available
> for planting before the entire facility is completed.

29.    On May 14, 2019, Aurora issued a press release announcing its third

quarter 2019 financial results for the quarter ended March 31, 2019.  The release again

highlighted Aurora's purported strong execution in meeting growing consumer

demand and controlling costs.  The press release stated in pertinent part:

"I'm exceptionally proud of our company and team as Aurora continues to deliver on our domestic and international growth strategy. We achieved solid revenue growth and strong operating results in a quarter proven challenging across the industry. We are laser focused on building a long-term sustainable business," said Terry Booth, CEO. "During the quarter, we formally welcomed Nelson Peltz a key strategic advisor. He has been incredibly engaged, collaborative, and strategically focused on assisting our pursuit of growth in global markets and with mature companies in adjacent industries."

Glen Ibbott, CFO, added, "Aurora is an extremely active and diversified company, leading the industry in cannabis research, product development, cultivation, global scale, and revenue growth. With a solid Q3 on all fronts, it's time to move the yardsticks for the industry again. ***The company we have built with purpose through both organic growth and targeted acquisitions has provided a unique opportunity: continue to lead the industry in revenue growth while also progressing to positive operating earnings in the near term.***"

\*     \*     \*

***With Aurora Sky now operating at full capacity, the Company anticipates continued reduction in production and manufacturing costs allowing cash costs per gram to continue to trend lower***. Management reiterates its expectation that the average cash cost to produce per gram at its Sky Class facilities will be below $1.

With disciplined cost management, ***the Company expects SG&A costs to grow modestly over the remainder of the fiscal year***. Consequently, management anticipates that with sustained revenue growth and lower cash costs per gram, Aurora is well positioned to achieve positive EBITDA beginning in fiscal Q4 2019 (calendar Q2 2019).

30.    On June 21, 2019, Aurora issued a press release stating that it was "prepared" for the "expansion of Canada's cannabis market." The press release continued in pertinent part:

"Aurora is the world's leading producer of high-quality cannabis and we're ready to introduce high-value product additions to this improved, federally legal market," said the Company's CEO Terry Booth. "*From the beginning, we've invested in industry-leading production and distribution technology, and in consumer research to drive products to market that consumers will desire. These things, together with the dynamic partnerships we've entered into on the accessory and technology fronts*, position us well for this new market launch in December as per Health Canada's recent regulatory amendments."

31.    On August 6, 2019, Aurora issued a press release providing an update on its fourth quarter 2019 ("4Q19") results for the quarter ended June 30, 2019. The press release stated in pertinent part:

"Our Q4 2019 guidance highlights Aurora's continued leadership," said Terry Booth, CEO of Aurora. "We set out to be best-in-class cultivators, and through carefully evaluated acquisitions, *that vision continues to drive exceptional results today*. We are the leader in cultivation capacity, production available for sale and revenues for cannabis in the Canadian medical and consumer markets. We continue to lead the build out of European and other international medical cannabis markets. *Our success to date comes from a focus on quality, regulatory compliance, appropriate Board of Directors oversight, and delivering a profitable, low risk and sustainable business for our shareholders.*"

32.    On September 11, 2019, Aurora issued a press release announcing its 4Q19 and full-year 2019 financial results. The release represented that Aurora was continuing to meet evolving demand and successfully keeping costs under control as it continued to ramp up production. The press release stated in pertinent part:

Glen Ibbott, CFO, added, "*We continue to see strong growth in cannabis revenues in both medical and consumer categories. Our cultivation execution continues to drive production costs lower and*

*improve gross margins.  Aurora's diversified product portfolio remains in demand with patients and consumers alike*.  With the Canadian launch of derivative products in the coming months, we have made the necessary investments to ensure readiness and focus on a variety of value added products.  We are very excited to supply an expanded consumer market with premium cannabis and new product forms."

\*     \*     \*

*The global cannabis and hemp markets represent a significant opportunity for Aurora and the Company will continue to make the necessary investments today to build long-term value for shareholders*.  However, Aurora will take a balanced approach to these investments with a focus on operating a sustainable and profitable business.

The introduction of new product formats to the Canadian consumer market this fall represents a significant opportunity for the Company.  Aurora expects to have a robust product line-up ready to launch in December.  Given the very early stage of development of the consumer market in Canada and international medical markets, management anticipates that quarter to quarter sales volumes and revenues may be volatile.  *The Company expects adjusted EBITDA to continue to improve in the future due to expected revenue growth, improvements in gross margin and prudent SG&A growth.*

33.     On October 3, 2019, Aurora issued a press release updating investors on its global growth initiatives and operations, and specifically on the status of its construction projects for the Aurora Nordic 2 and Aurora Sun facilities.  The press release stated in pertinent part:

"Aurora takes its leadership position in the global cannabis industry seriously, and is committed to being open and transparent with all of our stakeholders," said Terry Booth, CEO of Aurora.  "The Aurora team is working to advance several major strategic initiatives in Canada, the United States and abroad aimed at further strengthening Aurora's global position.  We are laser-focused on delivering on our business plan and prudently managing our investors' capital."

**Update on Facilities in Construction:**

As Aurora executes on its strategy of leading scalable, purpose-built cultivation, it continues to prudently manage capital allocation decisions driven by global forecasts for demand. Many of the Company's significant construction projects are nearing completion of major milestones with significant capital investments concluded.

**Aurora Sun and Aurora Nordic 2 Construction Update**

*Aurora continues to progress construction of its 1.6 million square foot facility, Aurora Sun, located in Medicine Hat, Alberta*, and its 1 million square foot facility, Nordic Sky, strategically located in Odense, Denmark. The new purpose-built, "Sky Class" facilities Aurora are [sic] constructing will have full control over all anticipated environmental and harvest conditions, resulting in the production of consistently high yielding, high-quality cannabis at low-cost.

Mr. Booth added, "*Aurora Sun in Medicine Hat and Aurora Nordic in Denmark represent the next evolution of our "Sky Class" cultivation philosophy and construction of these projects is proceeding well. Aurora Sun is nearing completion with the majority of capital investment now behind us, while at Aurora Nordic the primary outdoor construction, including the enclosure of the facility, nears completion*. Our design philosophy allows for flexibility in licensing and commissioning in-line with the long-term growth in global demand for medical cannabis."

34. The statements referenced in ¶¶18-33 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations and financial condition, which were known to or recklessly disregarded by defendants:

(a) that defendants had materially overstated the demand and potential market for Aurora's consumer cannabis products;

- 15 -

(b)     that Aurora's ability to sell products had been materially impaired by extraordinary market oversupply, including oversupply that was the product of Aurora's own aggressive ramp in production capacity;

(c)     that Aurora's spending growth and capital commitments were slated to exceed its revenue growth;

(d)     that, as a result of (a)-(c) above, Aurora faced heightened liquidity concerns and the need to significantly curtail capital expenditures, including the cessation of development of the Aurora Sun and Aurora Nordic 2 facilities;

(e)     that Aurora had violated German law mandating that companies receive special permission to distribute medical products exposed to regulated irradiation techniques, threatening its primary European market access; and

(f)     that all of the foregoing had negatively impacted the Company's business, operations, and prospects and impaired the Company's ability to achieve profitability as represented by defendants.

35.     Then, on November 14, 2019, Aurora announced deeply disappointing financial results for its first quarter of 2020 ("1Q20"), ended September 30, 2019. The Company stated it had generated net income of only C$12.8 million compared to C$105.5 million in the year-ago period, representing a nearly 90% decline. The Company also posted an adjusted loss of C$39.7 million, nearly 50% larger than the C$20.8 million expected by analysts. The results further showed a C$23.8 million, or

a 25%, sequential ***decline*** in sales, despite defendants' claims of rapidly growing consumer demand.  Shockingly, Aurora's consumer cannabis revenue fell by 33% and its wholesale bulk revenue fell by 49% sequentially.  In the release, Aurora admitted that recreational cannabis orders from the provinces had "slowed considerably" in the summer.  To stem the Company's dire capital needs, Aurora also announced that it was indefinitely deferring the remaining construction and commission activities at Aurora Sun and Aurora Nordic 2, despite reassuring investors about the purportedly successful progress on the facilities only a few weeks previously.

36.     During Aurora's earnings call to discuss the 1Q20 results, defendant Booth belatedly acknowledged the market oversupply and stated that this drop-off was anticipated heading into the quarter, despite defendants' prior statement to the contrary, stating that, "yes, ***we had a drop in cannabis sales, but it was anticipated. The provinces were oversupplied***."

37.     Analysts were shocked and dismayed by the Company's disclosures.  For example, in a November 15, 2019 report entitled "Q1: Investor Conviction Around No More Dilution Likely to be Minimal," Jeffries analyst Owen Bennett stated that "lack of investor trust" was "likely to remain a headwind."  The Jeffries report stated:

> With possible cash pressures evident, announcing ceased construction at facilities despite a press release just 6 weeks ago praising progression, and now EBITDA (and cash) positive looking unlikely this year, it would be fair for investors not to believe them.  Linked to trust are possible surprises on write-downs.

It further suggested that Aurora would likely have to take goodwill impairments.

38.     Similarly, an article in *Marketwatch.com* dated November 18, 2019, entitled "Aurora Cannabis stock suffers worst day in more than five years, analyst says 'it would be fair for investors not to believe them,'" provided the following additional detail:

> Analysts said that investors had a reason for anger and distrust after the report, and should be thinking about whether it means that it is time to run away from the cannabis industry altogether.
>
> "If Aurora is less eager to deploy capital to this industry, we believe investors should also be reluctant to place capital in the industry," MKM Partners analyst Bill Kirk, who has a sell rating and $3 price target on the stock, wrote in a note.
>
> Jeffries analyst Owen Bennett noted that dilution from the debenture conversion could swing investor sentiment even more, and believes a writedown for a goodwill impairment from the MedReleaf acquisition could be on the way.  He also suggested that beyond negative sentiment, investor trust could be a real issue after Aurora's optimistic statement before Thursday's disappointment.
>
> "With possible cash pressures evident, announcing ceased construction at facilities despite a press release just 6 weeks ago praising progression, and now EBITDA (and cash) positive looking unlikely this year, it would be fair for investors not to believe them," wrote the analyst . . . .

39.     Following these revelations, the price of Aurora common stock declined. On November 15, 2019, Aurora's share price fell $0.56 per share, from $3.29 per share on November 14, 2019 to $2.73 per share on November 15, 2019, or over 17%, on unusually heaving trading volume.

40.     Then, on November 29, 2019, *Marijuana Business Daily* reported that German pharmacies were recently asked to stop the sale of Aurora's cannabis products by German health authorities.  The report stated that the Company's products were awaiting inspection by health authorities due to a proprietary step in Aurora's production process.  The report also stated the production step in question was connected to a method that Aurora uses to protect the shelf life of the flower, which was later reported to relate to irradiation techniques.  As later reports noted:

> Even if the interruption is short, it could create undesirable consequences for the company, as patients who already use Aurora's product will have to switch to another supplier.

> If and when Aurora's product sales commence again, patients would need a new prescription, and doctors are known to be reluctant about prescribing products with inconsistent availability, according to Marijuana Business Daily.

41.     Following these revelations, the price of Aurora common stock again declined.  On November 29, 2019, Aurora's share price fell $0.17 per share, from an open of $2.61 per share on November 29, 2019 to a close of $2.44 per share on December 2, 2019, or approximately 7%.

42.     On Friday, December 20, 2019, Aurora filed an insider transaction disclosure revealing that defendant Dyck had sold 1,082,500 shares of Aurora at C$3.095 per share, representing about 57% of his holdings.

43.     Shortly thereafter, on Saturday, December 21, 2019, after an internal memo leaked, Aurora issued a press release announcing that defendant Battley, the

Company's CCO, and would be stepping down.  Media reports stated that Battley had been forced out.

44.     On this news, the price of Aurora common stock fell once again. Aurora's share price fell from $2.25 per share on December 20, 2019 to $2.01 per share on December 23, 2019, or more than 10%.

45.     Then, on January 6, 2020, media reports stated that the Company had listed its nine-hectare greenhouse in Exeter, Ontario, for sale for $17 million.  Aurora had obtained the greenhouse as part of its $3.2 billion acquisition of MedReleaf Corp. in 2018.  Analysts immediately connected the move as implying that significant write-downs could be on the horizon.  For example, MKM Partners analyst Bill Kirk said in a January 7, 2019 note to clients: "This listing, for 75% of former MedReleaf's capacity, signals major writedowns ahead."   Kirk further criticized Aurora's management for their lack of candor: "We are also discouraged with the visibility of Aurora's strategy – investors were unaware Aurora was trying to sell Exeter," despite a corporate update on December 23, 2019.  Kirk said he expected the Company to record C$2 billion worth of write-downs.

46.     Following these revelations, the price of Aurora common stock declined again.  On January 6, 2020, Aurora's share price fell $0.19 per share, from an open of $2.02 per share on January 6, 2020 to a close of $1.83 per share on January 7, 2020, or nearly 10%.

47.     As a result of defendants' wrongful acts and omissions, plaintiff and the Class (defined below) purchased Aurora securities at artificially inflated prices, suffered significant losses and were damaged thereby.

## NO SAFE HARBOR

48.     Defendants' "Safe Harbor" warnings accompanying Aurora's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  Because most of the false and misleading statements related to existing facts or conditions, the Safe Harbor has no applicability. To the extent that known trends should have been included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

49.     The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer and/or director of Aurora who knew that the FLS was false.  In addition, the FLS were contradicted by existing undisclosed material facts that were required to be disclosed so that the FLS would not be misleading.  Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that

had already materialized or failed to provide any meaningful disclosures of the relevant risks.

## ADDITIONAL SCIENTER ALLEGATIONS

50.     As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and actions intended to manipulate the market price of Aurora securities as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Aurora, their control over, and/or receipt or modification of Aurora's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Aurora, participated in the fraudulent scheme alleged herein.

51.     Defendants had reason to conceal this information from the investing public.  Aurora needed to keep the price of its stock inflated in order to continue with its acquisition and expansion strategy, which included several acquisitions paid for with inflated Aurora stock.  In addition, Aurora wanted to keep its stock price inflated in order to qualify for and be listed on the NYSE.  Finally, Aurora filed a shelf

registration statement on Form F-10 to make offerings of common shares, debt securities, subscription receipts, units, warrants or any combination thereof of up to US$750 million during the Class Period.

52.     The adverse developments at issue also impacted the Company's most important revenue streams and directly contradicted defendants' public representations regarding the state of Aurora's business and the success of the Company's strategic initiatives.  For example, Aurora revealed that it was halting production on facilities only a few weeks after it had praised the production of such facilities.  The Individual Defendants have also held themselves out to investors as the executives most knowledgeable about the adverse facts impacting Aurora's business alleged herein, and have belatedly admitted on conference calls that they knew about slowing demand trends during the Class Period.  As such, the Individual Defendants knew or were reckless in not knowing of the undisclosed facts detailed herein.

## LOSS CAUSATION

53.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Aurora securities and operated as a fraud or deceit on purchasers of Aurora securities.  As detailed above, when the truth about Aurora's misconduct was revealed over time, the value of the Company's securities declined precipitously as the prior artificial inflation no longer propped up the securities' prices.  The declines in the

prices of Aurora securities were the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price declines negate any inference that the losses suffered by plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company specific facts unrelated to the defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of the Company's securities and the subsequent significant decline in the value of the Company's securities when defendants' prior misrepresentations and other fraudulent conduct were revealed.

54. At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Aurora's business, operations, and financial condition, as alleged herein. Throughout the Class Period, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the prices of Aurora's securities to be artificially inflated. Plaintiff and other Class members purchased Aurora securities at those artificially inflated prices, causing them to suffer damages as complained of herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

55.   At all relevant times, the market for Aurora securities was an efficient

market for the following reasons, among others:

(a)   Aurora stock met the requirements for listing and was listed and

actively traded on the NYSE, a highly efficient and automated market;

(b)   according to the Company's Form 40-F for the fiscal year ended

June 30, 2019, it had in excess of 1 billion common shares outstanding;

(c)   as a regulated issuer, Aurora filed periodic public reports with the

SEC;

(d)   Aurora regularly communicated with public investors via

established market communication mechanisms, including the regular dissemination

of press releases on national circuits of major newswire services, the Internet, and

other wide-ranging public disclosures; and

(e)   unexpected material news about Aurora was rapidly reflected in

and incorporated into prices for the Company's securities during the Class Period.

56.   As a result of the foregoing, the market for Aurora securities promptly

digested current information regarding Aurora from publicly available sources and

reflected such information in the prices of Aurora securities.   Under these

circumstances, all purchasers of Aurora securities during the Class Period suffered

similar injury through their purchase of Aurora securities at artificially inflated prices, and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

57.    This is a class action on behalf of all purchasers of Aurora securities during the Class Period who were damaged thereby (the "Class").  Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

58.    Common questions of law and fact predominate and include: (a) whether defendants violated the Exchange Act; (b) whether defendants omitted and/or misrepresented material facts; (c) whether defendants knew or recklessly disregarded that their statements were false; (d) whether the prices of Aurora securities were artificially inflated during the Class Period; and (e) the extent of and appropriate measure of damages.

59.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Aurora common shares were actively traded on the NYSE.  Upon information and belief, these shares are held by hundreds or thousands of individuals located geographically throughout the country.

60.     Plaintiff's claims are typical of those of the Class.   Prosecution of individual actions would create a risk of inconsistent adjudications.   Plaintiff will adequately protect the interests of the Class.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

61.     Plaintiff incorporates ¶¶1-60 by reference.

62.     During the Class Period, defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

63.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they, directly and indirectly, by the use of the means or instrumentality of interstate commerce, or the mails or facility of a national securities exchange:

        (a)     Employed devices, schemes, and artifices to defraud;

        (b)     Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Aurora securities during the Class Period.

64.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Aurora securities. Plaintiff and the Class would not have purchased Aurora securities at the prices they paid, or at all, had they been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

65.     By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

66.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Aurora securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

67.     Plaintiff incorporates ¶¶1-66 by reference.

68.     During the Class Period, the Individual Defendants acted as controlling persons of Aurora within the meaning of §20(a) of the Exchange Act.  By virtue of their share ownership, executive and Board positions and stock ownership, and their culpable participation, as alleged above, the Individual Defendants had the power to

influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends were false and misleading as detailed herein.

69.     The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.  In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

70.     By reason of such wrongful conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

71.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  January 16, 2020                    CARELLA, BYRNE, CECCHI, OLSTEIN,
                                            BRODY & AGNELLO, P.C.


                                            _____
                                            /s/ James E. Cecchi
                                            JAMES E. CECCHI

5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)
jcecchi@carellabyrne.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
BRIAN E. COCHRAN
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)
bcochran@rgrdlaw.com

ADEMI & O'REILLY, LLP
GURI ADEMI
3620 East Layton Avenue
Cudahy, WI  53110
Telephone:  414/482-8000
414/482-8001 (fax)

Attorneys for Plaintiff